IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

DAVID HACKMAN                                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:25-CV-225-SA-JMV

WWEC HOLDINGS III, CORP.                                         DEFENDANT

ORDER AND MEMORANDUM OPINION

On August 4, 2025, David Hackman initiated this litigation by filing his Petition to Enroll/Enforce Arbitration Award [1] against WWEC Holdings III, Corp. Now before the Court is WWEC's Motion to Dismiss [24]. Having considered the parties' filings, as well as the applicable authorities, the Court is prepared to rule.

*Relevant Background*

The underlying facts and procedural history of this dispute are convoluted and involve multiple lawsuits.

Prior to December 22, 2023, Hackman owned all of the outstanding shares of North American Electric, Inc. ("NAE"), which was a Mississippi corporation that specialized in selling electric motors, motor controls, and gearing. On December 22, 2023, NAE underwent a reorganization and was converted to an LLC. Following the reorganization, Hackman owned all of NAE's outstanding units through NAE Holdco, Inc. ("Holdco"), a Mississippi corporation.

On December 29, 2023, WWEC, a Delaware corporation with its principal place of business located in New York, purchased NAE via a securities purchase agreement ("SPA"). The SPA states that the parties to the agreement include WWEC, NAE, Holdco, and Hackman and provides a purchase price of $28.9 million, subject to specific adjustments, plus a potential earnout

payment to Hackman based on NAE's adjusted EBITDA for the 12-month period ending June 30, 2024.

The parties' dispute centers around the earnout. Section 1.5 of the SPA contains a specific formula for calculation of the potential 2024 earnout payment, as well as a separate formula for a potential catch-up earnout payment:

(a)      As additional consideration for the Sold Units, following the Closing, contingent upon satisfaction of the criteria in this Section 1.5, the Seller shall receive the payments contemplated by this Section 1.5.

(b)      The 2024 Earnout Payment (if any) for the 12-month period ended June 30, 2024 (the "Earnout Period") shall be calculated as follows:

     (i) if the Adjusted EBITDA during the Earnout Period (the "Earnout Period EBITDA") is equal to or greater than $5,400,000 (the "Upper Limit"), Seller shall be entitled to receive $10,000,000 (the "Maximum Earnout Payment") as the Earnout Payment;

     (ii) if the Earnout Period EBITDA is equal to or below $3,900,000 (the "Lower Limit"), Seller shall not be entitled to receive any portion of the 2024 Earnout Payment; and

     (iii) if the Earnout Period EBITDA is greater than the Lower Limit but below the Upper Limit, then the Seller shall be entitled to receive a payment in the amount calculated as follows (such one-time payment, the "2024 Earnout Payment"):

*(Earnout Period EBITDA — Lower Limit) * (6.6667) = 2024 Earnout Payment*

For the avoidance of doubt, in no event shall the 2024 Earnout Payment exceed the Maximum Earnout Payment.

(c) Catch-Up Earnout Payment. The Catch-Up Earnout Payment (if any) for the Earnout Period shall be calculated as follows:

     (i) if the Earnout Period EBITDA is equal to or greater than $3,900,000 (the "Catch-Up Upper Limit"), Seller shall be entitled to receive $1,096,038 (the "Catch-Up Maximum Earnout Payment") as the Catch-Up Earnout Payment;

2

(ii) if the Earnout Period EBITDA is equal to or below $3,757,515 (the "Catch-Up Lower Limit"), Seller shall not be entitled to receive any portion of the Catch-Up Earnout Payment; and

(iii) if the Earnout Period EBITDA is greater than the Catch-Up Lower Limit but below the Catch-Up Upper Limit, then the Seller shall be entitled to receive a payment in the amount calculated as follows (such one-time payment, the "Catch-Up Earnout Payment"):

*(Earnout Period EBITDA — Catch-Up Lower Limit) * ($7.69) = Catch-Up Earnout Payment*

For the avoidance of doubt, in no event shall the Catch-Up Earnout Payment exceed the Catch-Up Maximum Earnout Payment.

[24], Ex. 1 at p. 12-13.

As this contractual language makes clear, each of the formulas is based upon NAE's EBITDA, which in turn renders critical the manner in which the EBITDA is calculated. On that point, Section 1.5(e) includes a specific procedure for the determination of the adjusted EBITDA and the parties' rights related thereto:

(e)      Determination of Adjusted EBITDA.

(i) No later than forty five (45) days after the unaudited consolidated financial statements of the Company and its Subsidiaries for the Earnout Period (the "Earnout Period Financial Statements") are completed, Buyer shall deliver to Seller a statement containing the calculations of (A) Adjusted EBITDA during the Earnout Period, and (B) the Earnout Payments, with reasonable backup for such calculations made therein (the "Earnout Payment Statement").

(ii) The Earnout Payment Statement shall be prepared by Buyer based upon the Earnout Period Financial Statements and other books and records of Company. If Seller does not submit any written comments to the Earnout Payment Statement within thirty (30) days of receipt thereof, then Seller will be deemed to have approved such Earnout Payment Statement, and such Earnout Payment Statement (and the calculations and amounts contained therein) shall be final and binding on the Parties. If Seller delivers written comments to Buyer regarding the Earnout Payment Statement within such 30-day timeframe, then Buyer and Seller shall use good faith efforts to resolve any dispute in connection with such comments. In the event Buyer and Seller are unable to agree

3

within 30 days after Seller's delivery of such written comments (or such longer period as Seller and Buyer shall mutually agree), Buyer and Seller shall engage the Arbiter to resolve the dispute in accordance with the guidelines and principles set forth in this Agreement. In resolving any dispute with respect to the Earnout Payment Statement, the Arbiter (A) may not assign a value to any item greater than the highest value claimed for such item or less than the lowest value for such item claimed by either Buyer or Seller, (B) shall restrict its decision to such items included in the objection(s) which are then in dispute, and (C) shall render its decision in writing within thirty (30) calendar days after the disputed item(s) have been submitted to it. *The resolution of the Earnout Payment Statement disputed items by the Arbiter shall be conclusive and binding on the Parties for the purposes of this Agreement absent fraud or intentional misrepresentation by any Party or manifest error by the Arbiter, and the Parties agree that judgment may be entered upon such determination of the Arbiter in any court having jurisdiction over any Party in order to enforce such determination.* The fees, costs and expenses of the Arbiter shall be borne by each Party in the percentage inversely proportionate to the percentage of the total amount of the total items submitted for dispute under this Section 1.5(e) that are resolved in such Party's favor, with such expense allocation being determined by the Arbiter.

*Id*. at p. 13-14 (emphasis added).

Of particular importance in this litigation, the SPA contains a separate choice-of-law provision in favor of Delaware law, as well as a separate section (Section 8.10) entitled "Consent to Jurisdiction; Service of Process; Waiver of Jury Trial" which provides in pertinent part:

Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought *exclusively* in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action, the United States District Court for the District of Delaware, and each of the Parties hereto hereby irrevocably submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action or other proceeding.

*Id*. at p. 75 (emphasis added).

Consistent with its obligation under the SPA regarding the earnout determination, after the conclusion of the earnout period, WWEC delivered to Hackman the earnout payment statement,

4

which calculated the adjusted EBITDA as $3,795,469 resulting in an earnout payment of $291,868. Hackman disagreed with the calculation and submitted to WWEC an objection with an adjusted EBITDA calculation of $4,329,290, which would yield an earnout payment of $3,957,985.64.

In simplified terms, Hackman and WWEC disagreed as to four distinct items related to NAE's operations during the earnout period and whether those items should be included in the adjusted EBITDA calculation. A brief explanation of each of the four items is necessary to provide context regarding the parties' dispute:

- *Disputed Item 1 - Reno Costs* — This dispute concerns NAE's decision not to renew its lease on a warehouse located in Reno, Nevada during the Earnout Period. The parties disagree as to whether the moving costs associated with moving inventory from that warehouse to a separate warehouse should be included in the EBITDA calculation;

- *Disputed Item 2 - Employee Raises* — This dispute concerns NAE's decision to provide raises to employees during the Earnout Period. Hackman contends that across-the-board employee raises were outside of the ordinary course of business and should therefore be treated as an add-back to the EBITDA;

- *Disputed Item 3 - WESCO Order #1* — This dispute concerns a large custom order that Hackman contends was completed and prepared to ship to the customer (WESCO) prior to the end of the Earnout Period but was delayed beyond the June 30, 2024 deadline; and

- *Disputed Item 4 - WESCO Order #2 and Crum Order* — This dispute concerns two additional orders which Hackman contends were completed and prepared to ship prior to the end of the Earnout Period but were delayed beyond the deadline.[1]

After Hackman and WWEC further corresponded with each other and were eventually unable to resolve their disagreements, they engaged an arbiter as authorized by Section 1.5(e)(ii) of the SPA. On April 24, 2025, Hackman and WWEC executed an engagement letter with Glenn

---

[1] In providing these brief explanations, the Court is not endeavoring to fully explain the circumstances surrounding the disputes, as a full synopsis would necessitate a deeper dive into the underlying facts. Instead, the Court simply articulates a general explanation to provide some context.

Pomerantz, a certified public accountant, to serve as the arbiter. The parties made initial and rebuttal presentations and responded to an information request from Pomerantz shortly thereafter.

On July 1, 2025, Pomerantz issued his Adjustment Report. In that Report, Pomerantz resolved Disputed Item 1 (Reno Costs), Disputed Item 2 (Employee Raises), and Disputed Item 4 (WESCO Order #2 and Crum Order) in WWEC's favor. He resolved Disputed Item 3 (WESCO Order #1) in Hackman's favor. He therefore concluded that the "Earnout Period EBITDA, as calculated by [WWEC] in its Earnout Payment Statement, should be adjusted to reflect an increase in the amount of $320,250." [24], Ex. 3 at p. 21.

Serial litigation has since ensued. First, Hackman filed this lawsuit. In his Petition [1], he asserts that "as a result of the Arbiter's Final Arbitration Award/Ruling, WWEC owes [him] a total of $2,538,204.86." [1] at p. 4. He requests that the Court confirm the award pursuant to the Federal Arbitration Act.

Seventeen days later, on August 21, 2025, Hackman filed a separate lawsuit against WWEC in this Court, wherein he alleged claims of fraud and negligent misrepresentation. *See Hackman v. WWEC Holdings III, Corp.*, N.D. Miss. Cause No. 3:25-CV-246-SA-RP. Specifically, Hackman alleged there that WWEC acted fraudulently or, alternatively, made negligent misrepresentations in connection with the treatment of employee raises (Disputed Item 2) and WESCO Order #2 and the Crum Order (Disputed Item 4). He essentially contended that, absent WWEC's alleged fraud and/or misrepresentations in relation to those Disputed Items, his earnout payment would have been approximately $790,832.87 higher.

On August 22, 2025, yet another lawsuit was filed—this time, WWEC filed suit against Hackman in the Court of Chancery of the State of Delaware. In its amended complaint in that case, WWEC asserted four separate claims for declaratory relief, seeking declarations that the arbiter

6

exceeded the scope of his authority (Count 1), that the arbiter committed manifest error (Count 2), that WWEC did not commit fraud (Count 3), and that WWEC did not commit negligent misrepresentation (Count 4). *See* [24], Ex. 4. WWEC also asserted a separate breach of contract claim (Count 5), alleging that Hackman breached the SPA's forum selection clause when he filed the present lawsuit in this Court.

On March 25, 2026, the Delaware Court of Chancery entered a Memorandum Opinion Resolving Motion to Dismiss, which disposed of a motion to dismiss that Hackman had filed in that case. *See* [34], Ex. 1. In that opinion, the Court of Chancery dismissed Counts 1 and 2 of WWEC's amended complaint (along with Count 5 to the extent it was based on Counts 1 and 2) and specifically noted that it was doing so in favor of the case *sub judice*. *Id*. at p. 25. In other words, the Delaware Chancery Court recognized that the allegations in Counts 1 and 2 of WWEC's amended complaint ought to be addressed in the present case. But the Delaware court declined to dismiss WWEC's declaratory judgment claims related to fraud and negligent misrepresentation, reasoning that Section 8.10 of the SPA governs that portion of WWEC's amended complaint. *Id*. Subsequently, Hackman voluntarily non-suited the other lawsuit he had filed in this Court, which again was based upon alleged fraud and negligent misrepresentation. *See Hackman v. WWEC Holdings III, Corp.*, N.D. Miss. Cause No. 3:25-CV-246-SA-RP at [35].

Therefore, the remaining active lawsuits consist of this case, wherein Hackman requests that this Court enforce the arbiter's award, and the Delaware litigation wherein WWEC's remaining claims seek a declaration that it did not commit fraud or negligent misrepresentation.[2]

---

[2] Since advising this Court of the Delaware Chancery Court's March 25, 2026 ruling, the parties have not provided an update as to any of the events ongoing in the Delaware litigation. Thus, the Court lacks any knowledge as to the events that have transpired since that time.

*Analysis and Discussion*

With that intricate background in mind, the Court turns to the present Motion [24] in this litigation. WWEC raises multiple arguments for dismissal, ranging from an assertion that this Court lacks personal jurisdiction over it, to the Federal Arbitration Act being wholly inapplicable, to improper venue. Alternatively, WWEC requests that the Court stay this litigation pending resolution of the Delaware litigation. The Court will attempt to methodically walk through the relevant arguments.

## I. Personal Jurisdiction

WWEC first argues that this Court lacks authority over it based upon a lack of personal jurisdiction.

Generally speaking, "[a] federal court 'may exercise personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.'" *Eastern Concrete Materials, Inc. v. ACE American Ins. Co.*, 948 F.3d 289, 295-96 (5th Cir. 2020) (quoting *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004)).

In pertinent part, Mississippi's long-arm statute provides:

> Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

MISS. CODE ANN. § 13-3-57.

8

Thus, the long-arm statute contains a contract prong, a tort prong, and a "doing business" prong. *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 894 (5th Cir. 2024). "Satisfaction of any of the three prongs, be it through contract, tort, or doing business, establishes personal jurisdiction over a nonresident [defendant]." *Id*. (quoting *Adara Networks Inc. v. Langston*, 301 So. 3d 618, 623 (Miss. 2020)).

Setting aside the substance of the long-arm statute, the crux of WWEC's argument is a threshold one that Hackman cannot utilize the long-arm statute whatsoever because he is not—and was not at the time the Petition [1] was filed—a Mississippi resident. To support this theory, WWEC emphasizes the Fifth Circuit's prior conclusion, in analyzing the Mississippi long-arm statute, that "[a] plaintiff who is not a resident of Mississippi . . . may not take advantage of the contract portion of the Mississippi long-arm statute." *Submersible Sys., Inc. v. Perforadora Central, S.A. de C.V.*, 249 F. 3d 413, 418 (5th Cir. 2001) (citing *Lifeline Ambulance Servs., Inc. v. Laidlaw, Inc.*, 16 F. Supp. 2d 686, 688 (S.D. Miss. 1998)). This Court has more recently recognized this rule. *See Wilmington Trust, N.A. v. Lincoln Benefit Life Co.*, 328 F. Supp. 3d 586, 593 (N.D. Miss. 2018). Relying on this principle, WWEC alleges that since Hackman now resides in North Carolina, he cannot utilize the long-arm statute to hale WWEC into federal court in Mississippi.

Although WWEC's position is an accurate statement of the law, the cases on which it relies are distinguishable from this one in at least one significant respect. Specifically, in this case, the parties, in Section 1.5 of the SPA, agreed "that judgment may be entered upon such determination of the Arbiter in *any* court having jurisdiction over *any* Party in order to enforce such determination." [24], Ex. 1 at p. 14 (emphasis added).

The Court finds this fact critical since "[p]ersonal jurisdiction can be waived by an enforceable forum selection clause in which the parties consent to personal jurisdiction in a

9

specified forum." *New South Equip. Mats, LLC v. Keener*, 989 F. Supp. 2d 522, 526 (S.D. Miss. 2013) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n. 14, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). Section 1.5 of the SPA specifically contemplates an action seeking to enforce a decision of an arbiter—the precise relief sought in this lawsuit—and authorizes the same in *any* court having jurisdiction over *any* party. Thus, for purposes of an action to enforce the determination of an arbiter (as is the case here), WWEC consented to personal jurisdiction "in any court having jurisdiction over any Party[.]" [24], Ex. 1 at p. 14.

Hackman provided the Court with an affidavit wherein he represents to the Court that he was a Mississippi resident at the time he sold NAE. *See* [31] at p. 3. He remained a Mississippi resident until moving to North Carolina in July 2025 but still owns property in DeSoto County, Mississippi. *Id*. at p. 1. And he sold a Mississippi business to WWEC. Considering the SPA's broad language, the Court would be hard pressed to conclude that it lacks jurisdiction over Hackman on these facts.

But even if there were no jurisdiction over Hackman, the Court finds it noteworthy that, in addition to Hackman and WWEC, the SPA was entered into by NAE and Holdco. Thus, the *any party* language in that context could arguably extend to any of the parties to the SPA—not just the parties to this litigation. This is important since, according to Hackman's affidavit, NAE and Holdco are now—and have at all times been—Mississippi entities. *Id*. ("NAE is a business that has been and still is located at 350 Vaiden Drive, Hernando, Mississippi."). Therefore, this Court has no issue concluding that this forum satisfies the "any court having jurisdiction over any Party" language contemplated in the SPA based on it having jurisdiction over NAE and Holdco. [24], Ex. 1 at p. 14.

Finally, the Court concludes that WWEC itself also falls within the parameters of Section 1.5's language. In its Memorandum [25], WWEC contends that this Court lacks jurisdiction over it because it, as a Delaware corporation headquartered in New York, is not "at home" in Mississippi, does not do business in the state, and has no general contacts in the state. WWEC goes on to contend that specific jurisdiction is not appropriate because:

> Hackman's petition . . . does not stem from any contact that either party has with Mississippi. Instead, his claim is based solely on an expert determination conducted and issued outside of Mississippi. Therefore, to establish specific jurisdiction over WWEC, Hackman must demonstrate that WWEC has sufficient contacts with Mississippi that arise from or directly relate to the expert's determination and Hackman's enforcement thereof. Hackman has made no such claims.

[25] at p. 17.

The Court finds this argument unpersuasive at best. WWEC emphasizes that the proceedings before the arbiter occurred outside of Mississippi. Yet it simultaneously wholly disregards the fact that the underlying SPA from which the proceedings before the arbiter arose was the purchase of a Mississippi entity—an entity which continues to operate in Mississippi to this day. Taking all of this into account, the Court finds that WWEC, like the other parties to the SPA, falls within the scope of the "any court having jurisdiction over any Party" language contemplated in the SPA. [24], Ex. 1 at p. 14.

In sum, WWEC consented to personal jurisdiction for an action of this nature in "any court having jurisdiction over any Party[.]" [24], Ex. 1 at p. 14. Applying that language, the Court concludes that it does indeed have jurisdiction over multiple parties to the SPA (and the parties to this litigation). WWEC's request for dismissal based on lack of personal jurisdiction is therefore rejected.

11

II.     *Forum*

Having resolved the existence of personal jurisdiction, the Court turns to WWEC's request for dismissal based on *forum non conveniens*.

"The doctrine of *forum non conveniens* allows a court to decline jurisdiction, even when the case is properly before the court, if the case may be tried in another forum more conveniently." *Sterling Commercial Credit, LLC v. Compliance Envirosystems, LLC*, 773 F. Supp. 3d 248, 252 (M.D. La. 2025) (citing *In re Volkswagen of Am., Inc.*, 545 F. 3d 304, 313 (5th Cir. 2008)). Analyzing "[t]he doctrine of *forum non conveniens* 'entails the same balancing-of-interests standard as a motion to transfer venue under 28 U.S.C. § 1404(a).'" *Smart Comms. Collier, Inc. v. Lowndes Cnty., Miss.*, 596 F. Supp. 3d 612, 615 (N.D. Miss. 2022) (quoting *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 61, 134 S. Ct. 568, 187 L. Ed. 2d 487 (2013)). That analysis typically involves consideration of "both the convenience of the parties and various public-interest considerations." *Id*. (citations omitted). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id*. (quoting *Atl. Marine*, 571 U.S. at 63, 134 S. Ct. 568).

This case presents a unique circumstance—specifically, the SPA contains two separate forum provisions. Predictably, each party emphasizes the provision that supports the relief it seeks—that is, Hackman contends this Court should retain jurisdiction and ultimately resolve the pending litigation based upon the language of Section 1.5, whereas WWEC contends that the Court should defer to Section 8.10.

To reiterate, Section 1.5(e)(ii) provides in pertinent part:

> The resolution of the Earnout Payment Statement disputed items by the
> Arbiter shall be conclusive and binding on the Parties for the purposes

12

> of this Agreement absent fraud or intentional misrepresentation by any Party or manifest error by the Arbiter, and the Parties agree that judgment may be entered upon such determination of the Arbiter in any court having jurisdiction over any Party in order to enforce such determination.

*Id.* at p. 14.

And Section 8.10, which is entitled "Consent to Jurisdiction; Service of Process; Waiver of Jury Trial" provides in pertinent part:

> Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought *exclusively* in the Delaware Court of Chancery in New Castle County, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action, the United States District Court for the District of Delaware, and each of the Parties hereto hereby irrevocably submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action or other proceeding.

*Id.* at p. 75 (emphasis added).

In addition to the separate forum provisions, there are other noteworthy legal principles at play. Consider the first-to-file rule. The Fifth Circuit has previously held that "[u]nder the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F. 3d 599, 603 (5th Cir. 1999) (citing *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F. 3d 947, 950 (5th Cir. 1997)) (additional citation omitted). The rule "rests of principles of comity and sound judicial administration" with the underlying purposes of avoiding duplication, rulings which encroach on the authority of sister courts, and piecemeal resolution of issues that call for a uniform result. *Id.* (quoting *Save Power*, 121 F. 3d at 950; *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F. 2d 721, 729 (5th Cir. 1985)).

13

Citing the first-to-file rule, Hackman emphasizes that he instituted this litigation prior to WWEC filing what he refers to as "a retaliatory lawsuit in the Delaware Chancery Court." [30] at p. 20.

Another consideration is the well-settled principle that specific provisions of a contract govern over general provisions. *See*, *e.g.*, *Baton Rouge Oil and Chem. Works Union v. ExxonMobil Corp.*, 289 F. 3d 373, 377 (5th Cir. 2002) (citing Restatement (Second) of Contracts § 203(c)) ("It is a fundamental axiom of contract interpretation that specific provisions control general provisions.").[3] While the parties agree that this overarching principle applies, their views of what constitutes specificity in regard to the SPA are divergent. For instance, Hackman contends that Section 1.5's language is the specific provision because it directly concerns enforcement of an arbiter's decision, which is the precise issue at hand in this litigation. Conversely, WWEC contends that Section 8.10 is the specific provision because it contains an explicit forum pursuant to which the parties agreed to litigate.

Taking all of these considerations into account and the lack of case law directly on point, the Court finds it appropriate to retain this lawsuit in this forum. Although the Chancery Court of Delaware undoubtedly would have been an appropriate forum (pursuant to the language of Section 8.10), the reality is that Section 1.5 specifically authorizes a suit of this precise nature to be filed in "any court having jurisdiction over any Party." [24], Ex. 1. at p. 14. This Court satisfies that condition. To be clear, if this litigation sought to impose liability based upon some other provision

---

[3] The Court cites federal law for this proposition because the enforceability of a forum selection clause is an issue of federal law, regardless of whether the contract itself contains specific language as to the applicability of a particular state's law. *See*, *e.g.*, *Smart Comms. Collier, Inc. v. Lowndes Cnty.*, 593 F. Supp. 3d 612, 615-16 (N.D. Miss. 2022). But this principle also holds true under Mississippi and Delaware law. *See*, *e.g.*, *Bowman v. Bowman*, 332 So. 3d 317, 323 (Miss. Ct. App. 2021); *Thompson St. Cap. Partners IV, L.P. v. Sonova U.S. Hearing Instruments, LLC*, 340 A. 3d 1151, 1166 (Del. 2025).

of the SPA, the outcome on this point likely would have been different; however, this is the precise type of action contemplated in Section 1.5.

In reaching this conclusion, the Court feels compelled to point out that while WWEC raises the doctrine of *forum non conveniens*, the bulk of its argument in that regard simply recites the applicable law and states in conclusory fashion that Delaware is an appropriate forum. But that wholly misses the mark as there is no dispute that the Delaware Chancery Court *could* have been an appropriate forum. WWEC does not fully grapple with the fact that Section 1.5 also authorizes an action of this nature to be filed in "any court having jurisdiction over any Party[.]" *Id*. By that same token, WWEC does not provide the Court with sufficient information as to why this Court, which was also agreed upon by the parties, could not fully resolve the dispute. This is particularly important considering the fact that the SPA concerns a Mississippi business and the underlying facts occurred in this state. Essentially, WWEC seeks dismissal on the basis of *forum non conveniens* but never fully articulates why this Court is not a convenient forum—instead, its argument simply collapses into its assertion that Section 8.10 controls. Ultimately, Hackman filed this lawsuit in an appropriate forum and did so *before* WWEC instituted the Delaware litigation.[4] On the record before it, the Court sees no reason to dismiss this lawsuit in favor of another forum.

Again, the facts of this case are unique. In reaching its conclusion, the Court does not wholly disregard Section 8.10 of the SPA or conclude that it is invalid. Rather, the Court finds that Hackman, as the plaintiff in this litigation who filed the first lawsuit in a forum that is appropriate under the SPA, is entitled to proceed here. WWEC's request for dismissal on this basis is rejected.

---

[4] The Court is cognizant that federal courts typically apply the first-to-file rule where there are multiple lawsuits pending before different *federal* courts. *See*, *e.g.*, *Cadle*, 174 F. 3d at 603 (explaining the first-to-file rule is usually applied when "related cases are pending before two *federal* courts") (emphasis added). Such is not the case here. However, to the extent that the first-to-file rule is applicable here, it weighs in favor of Hackman.

III.     Stay

Having concluded that this litigation may proceed in this forum, the Court next turns to WWEC's request that this litigation be stayed pending resolution of the Delaware Chancery Court litigation. To reiterate, the posture of that case is WWEC, as the plaintiff, against Hackman with the remaining claims being for declaratory judgment that it did not commit fraud (Count 3) and did not commit negligent misrepresentation (Count 4). *See* [24], Ex. 4.

More specifically, in Count 3 of its amended complaint in that case, WWEC seeks a judicial declaration that it "did not make false representations relating to the SPA and earnout, [it] did not intend for Hackman to rely upon oral statements made relating to the SPA and earnout, reliance upon any oral statements relating to the SPA and earnout was not justifiable, and Hackman was not damaged by any alleged statements." [24], Ex. 4 at p. 25-26. Similarly, in Count 4, WWEC seeks a declaration "that Hackman has no legally valid or viable negligent misrepresentation claim for the following reasons, among others: WWEC did not make false representations, negligent or otherwise, relating to the SPA and earnout, WWEC did not intend for Hackman to rely upon oral statements made relating to the SPA and earnout, reliance upon any oral statements relating to the SPA and earnout was not justifiable, and Hackman was not damages by any alleged statements." *Id*. at p. 27.

Considering the substance of that litigation, WWEC contends that this Court should stay the present litigation to avoid imposing unnecessary hardship on it by subjecting it to litigation that may "be substantially altered (and even mooted) by the outcome of the broader Delaware Action." [25] at p. 29. Hackman opposes a stay and contends that the Court should press forward, especially since this was the first filed suit.

16

To state it simply, the Court needs more information on this point. The parties' filings concerning the present Motion [24] in this case were made prior to the Delaware Chancery Court's issuance of its Memorandum Opinion on March 25, 2026. *See* [34], Ex. 1. The Court is interested in the parties' perspective as to the manner in which that ruling has impacted their respective positions as to the need to stay this litigation (or lack thereof). Additionally, the Court is wholly unaware of the status of that litigation since the Chancery Court's entry of its Memorandum Opinion.

While this Court certainly does not intend to unnecessarily subject the parties to duplicitous litigation that may eventually be rendered moot, it typically does not stay litigation pending the outcome of a separate lawsuit in a separate court. The Court will provide the parties an opportunity to submit additional briefing on that point. In that briefing, the parties should update the Court on the status of the Delaware litigation.

### IV. Federal Arbitration Act

Lastly, the Court finds it appropriate to briefly address WWEC's argument that Hackman's sole claim to enforce the arbiter's decision should be dismissed because the Federal Arbitration Act is altogether inapplicable. The basis for WWEC's argument is that the arbiter's decision is an expert determination—not an arbitration award. Hackman opposes this request but also notes that, should the Court deem otherwise, he could simply amend his pleading to state a breach of contract claim as another mechanism to seek judicial enforcement of the decision.

Here, in the SPA, the parties specifically agreed that "[t]his Agreement and the Exhibits and Schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions . . . that would cause the application of the Laws of any jurisdiction other than

the State of Delaware." [24], Ex. 1 at p. 75. Thus, the determination as to whether the FAA applies, which is governed by state law, is a question of Delaware law.

The Court need not analyze the nuances of Delaware law on this point at this time because, to articulate it simply, the issue seems to be premature at this stage of the proceedings. Other than the parties' cursory arguments about the proceedings before the arbiter, the Court has nothing to provide it a basis to analyze the issues. Therefore, the Court declines to address the issue at this time.

*Conclusion*

For the reasons set forth herein, the Motion to Dismiss [24] is DENIED. The parties shall have 14 days to file simultaneous supplemental briefs on the issue of whether a continued stay is appropriate. The case will remain stayed pending further Order following the submission of the supplemental briefs.

SO ORDERED, this the 28th day of July, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE